

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-21-00182-CR

_____

RYAN MATTHEWS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F17-3033-362

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Ryan Matthews shot and killed fifty-seven-year-old Randall Glover, his roommate's father, before dawn on July 31, 2017. Matthews claimed self-defense, but the jury found him guilty of murder and then assessed his punishment at 20 years' confinement upon determining that he had not acted under the immediate influence of sudden passion. *See* Tex. Penal Code Ann. § 19.02; *see also id.* § 12.32 (stating first-degree-felony punishment range is 5 to 99 years or life).

In a single issue, Matthews argues that the evidence was insufficient to disprove self-defense. Because the jury was entitled to assess the weight and credibility of Matthews's testimony, in addition to that of the other witnesses and the rest of the evidence, *see* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021), and to determine otherwise, we affirm the trial court's judgment.

### II. SELF-DEFENSE

Under the Penal Code, a person is justified in using force against another when and to the degree he "reasonably believes the force is immediately necessary to protect [himself] against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). When deadly force is used, the person using it must reasonably believe that deadly force is immediately necessary to protect himself from

2

another's use or attempted use of deadly force. *Id.* § 9.32(a); *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021).

After a defendant has introduced some evidence of self-defense, the State bears the burden of persuasion to disprove it. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Zuliani v. State*, 97 S.W.3d 589, 594 & n.5 (Tex. Crim. App. 2003). The State's burden does not require it to introduce evidence disproving the defense; rather, it requires the State to prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608. Self-defense is a fact issue to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991).

To determine evidentiary sufficiency to disprove a self-defense theory, we ask whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the appellant on the defensive issue beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 609; *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (evidentiary-sufficiency standard). The jury is entitled to resolve any conflicts in the evidence and to determine the witnesses' credibility. *Martin*, 635 S.W.3d at 679; *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd).

3

# III. DISCUSSION

## A. The State's Case[1]

Randall's daughter Chelsey Glover,[2] her stepbrother Spencer Thomas, and her best friend Amanda Baires testified during the State's case, as did responding emergency personnel, crime-scene and investigation personnel, and post-crime-scene examiners and analysts. The trial court admitted into evidence body-camera footage and 911 calls, as well as photographs of the gun, its magazine, and its bullets; crime-scene and autopsy photographs; the autopsy report; and three DNA reports.[3]

Chelsey and Matthews were roommates. Chelsey testified that she and Matthews had known each other since eighth grade and that they shared a mutual best friend—Kyle—the original lessor on the house where they lived. In 2016, Kyle moved out, and Chelsey moved in, paid Kyle's share of the rent, and assumed the lease when it expired.

In 2017, Chelsey's father Randall came over for a weekend but then stayed for eight months, sleeping on the living-room couch or in Chelsey's room if she slept at her then-boyfriend Joe's home. Chelsey said that she did not ask Matthews's

---

[1]We combine our evidentiary review with our analysis to avoid repetition.

[2]Because Chelsey and Randall share the same last name, we refer to them by their first names.

[3]Because no one disputes that Matthews fired the gun that killed Randall, we need not discuss evidence connecting Matthews to the gun.

permission for Randall to move in because Matthews was not a named lessor. Randall's presence caused friction with Matthews because Randall was "a clean freak," and Randall and Matthews each told Chelsey about their frustrations with the other.

On July 30, Chelsey invited Matthews to meet her, Joe, Thomas, and Baires at a bar, and he did so. Chelsey said that the more Matthews drank, the more comfortable he became with telling her how he felt about her father. He told Chelsey that Randall was a "bum,"[4] that he wanted her to kick him out, and that she should move in with Joe so that he could take over the lease. This made Chelsey uncomfortable,[5] and around ten or eleven p.m., she, Joe, and Thomas left the bar and went to Joe's house. Baires also left. Matthews stayed at the bar and kept drinking. His bar tab from that night showed that he bought twelve Shiner Bock beers, a Michelob Ultra, and two Vegas Bomb shots, as well as a carton of Camel Blue cigarettes.[6]

---

[4]Chelsey described Randall as hard-working. Baires stated that Randall had been like a father to her.

[5]Thomas testified that he did not recall any tension between Chelsey and Matthews at the bar, but Baires said the conversation between Chelsey and Matthews—which she described as "if you end up continuing to date Joe and you move in with him, I will kick your dad out and take over the lease"—had changed the evening's "vibe." Baires said the conversation was "[s]erious, yet flippant. Like it was not aggressive, but it was like he wanted to have the house to himself."

[6]Chelsey testified that she saw Matthews have four to six drinks between the time he arrived and the time she left. During his direct testimony, Matthews denied that he had consumed twelve beers and two shots, and he and Thomas both testified that it had been common for them to take turns buying rounds of drinks.

Around 4 a.m., Randall called Chelsey, waking her to ask her what was wrong with Matthews. He told Chelsey that Matthews had woken him up[7] and yelled at him. In the background, Chelsey heard Matthews yelling, "You bum. You f---king bum."[8] She heard him laughing and said that it sounded like his voice kept getting closer to the phone. Thomas said Chelsey had hollered on the phone, "telling them that they were being idiots and that they needed to cut it out and they're grown men and to knock it off."

Chelsey told her father to get out of the house and run to the police department, which was nearby. She and Thomas got into her vehicle to race home. Thomas said that Chelsey stayed on the phone while driving, "hollering at them and telling them to knock it off."

On the drive home, Chelsey heard the sounds of "tussling" and heard Randall tell Matthews to cool off. She heard Randall tell Matthews, "I am going to let you up and you need to cool off." Then she heard footsteps walk away and return[9] and heard Randall say, "He's got a gun. Call 911," followed by two gunshots.[10]

---

[7]Randall was in a T-shirt, shorts, and socks when he was killed.

[8]Chelsey also heard Matthews call her father a "piece of sh-t."

[9]When she was recalled during the defense case, Chelsey agreed that in her written police statement she had not mentioned hearing footsteps.

[10]The forensic evidence showed that only one shot was fired.

Chelsey screamed for her father but received no response. Then she heard Matthews say, "Ha-ha. Now you should call 911." Thomas said that Chelsey quieted and then said, "Did you just shoot my dad?" Thomas took the phone from her and called 911. He told the 911 operator about the gunshot and that they were five minutes away from the house.

Matthews also called 911. He reported, "Randy Glover, it's my roommate's dad, tried to f---king choke me out on the ground, and I broke away, and I shot him." He asked for 911 to send someone to revive Randall. When he was told to stay on the line, he argued that he needed to call his employer because he could not afford to lose his job.

The 911 dispatcher ordered Matthews to go back into the house and asked him where Randall's wound was. Matthews told her that it was "in the back of the neck" and that Randall was not breathing. She instructed him to begin cardiopulmonary resuscitation (CPR) and walked him through performing chest compressions. Matthews was still performing CPR on Randall when the police arrived several minutes later.[11] Matthews and Randall were in the kitchen just off the living room of the small house. Sergeant Thornton asked where the gun was, and Matthews told him that it was "right there on the ground."

---

[11]Then-Argyle Police Sergeant Daniel Rounsavall was dispatched at 4:15 a.m., and Northlake Police Sergeant Dwight Thornton was dispatched at 4:20 a.m.

Sergeant Thornton saw the gun on the kitchen table, and he seized it, removed the magazine, and then placed the gun and magazine in a police car.[12] Sergeant Rounsavall performed a protective sweep of the house and saw no other weapons.

Mon Nguyen, a firefighter paramedic, testified that he had been dispatched "right after 4:00 a.m." for a gunshot wound but that safety protocol had required waiting until the police cleared the scene. Once allowed on the scene, the paramedics assessed the unconscious victim. One initiated CPR while another put the victim on a defibrillation pad and monitor, which showed no cardiac output. The paramedics worked for two more minutes before calling Randall's time of death—4:35 a.m.—and releasing the scene to the police.

Sergeant Rounsavall testified that while waiting for the paramedics to complete their work, he told Matthews to have a seat in the yard. Instead of sitting, Matthews lay down on his stomach, mumbling, yelling, and crying. Chelsey and Thomas arrived around that time, and after she lunged at Matthews, Sergeant Rounsavall ordered her to stay back. Chelsey yelled at Matthews, "What have you done?" and Matthews cried, "He was f--king trying to choke me." Sergeant Rounsavall moved Matthews, who he said smelled overwhelmingly of alcohol, across the street, away from Chelsey. Matthews's speech was slurred, and his balance was unsteady.

---

[12]The gun was a 9-millimeter Luger with a magazine that could hold up to sixteen rounds. When the police photographed it, the gun had a bullet in the chamber and its magazine contained fourteen rounds.

Matthews told Sergeant Rounsavall that he and Randall had been involved in an altercation that had turned physical while they were arguing about, according to Matthews, "the fact that [Randall's] still here. The fact that it's been eight months and he's still here." Sobbing, Matthews told Sergeant Rounsavall that at some point Randall had Matthews in a sort of chokehold or headlock, and when he freed himself, he grabbed his pistol and instantly pulled the trigger, hitting Randall in the back of the neck. Sergeant Rounsavall placed Matthews in handcuffs and put him into his patrol car's back seat. During that time, Matthews told the sergeant that he could not afford to lose his job because he had to pay child support for his eight-year-old daughter. Matthews passed out in the patrol car's back seat.

Matthews had a small amount of blood on his shirt, his nose was a little swollen, he had dried blood on the end of his nose and inside his nostrils, and his neck showed some redness and scratches. He also had some bruising, scratches, and redness on his chest, some scrapes to his left shoulder and right elbow, and small bruises on his knees; Sergeant Rounsavall said Matthews looked "like he [had been] on the ground, rolling around scraping on the ground." On cross-examination, Sergeant Rounsavall agreed that Matthews's injuries were also consistent with having been in a struggle, that a chokehold could cause the death of the person being choked, and that one could still be in danger after escaping a chokehold.

Sergeant Rounsavall also testified that a few minutes after he placed Matthews in his patrol car, Chelsey learned that Randall had died. Her grief-stricken cries are audible in the body-camera footage.

At around 5 a.m., Louie Adams, Argyle's only police detective at that time, arrived at the scene. He called in Denton County's crime-scene unit because it had more resources and experience, and then he contacted the medical examiner's office. He observed Deputy Medical Examiner Tasha Greenberg's autopsy of Randall the next day.

Dr. Greenberg testified that Randall's cause of death, a homicide, was the gunshot wound, which had entered the left side of his neck below the ear and had exited on the right side of the neck just behind the right ear. Randall also had a small laceration on his forehead; some bruising on his left shoulder and upper back, which Dr. Greenberg opined might have been related to Randall's falling onto the edge of a cabinet door; and some small abrasions elsewhere, including on his knees. Randall had a scrape on his left hand that had been actively bleeding at the time of his death. He also had heart disease, significant blockages of his coronary arteries, and anthracosis (black pigment in his lungs from smoking).

With regard to the gun's proximity to Randall's gunshot wound, Dr. Greenberg opined that the gunshot was from a distance because there was no muzzle imprint to indicate that the muzzle had been against the skin, and there was no gunpowder tattooing from the impact of burning gunpowder, which occurs at an intermediate

range.[13] She stated that "distant usually implies from a few feet out to kind of infinity," and that it is difficult to determine an exact range of the gun's muzzle to the target because that depends on the specific gun, ammunition, and dimensions of the room where the shooting occurred.

On cross-examination, Dr. Greenberg said that two feet or more from muzzle to victim was the best she could estimate for the gunshot's distance. She acknowledged that Randall's shirt could have been tested for gunpowder particles to perform a more accurate distance determination, but she did not request such testing because it was difficult to perform and was not routine. DPS firearms and toolmark examiner Kevin Callahan testified that to his knowledge, there was no request for a distance determination. On redirect, he stated that DPS's policy was to perform a distance determination only when there is a bullet hole in clothing. If the bullet entry is on skin, then the medical examiner determines the distance. Randall's shirt was bloodstained and torn in the shoulder area but did not contain a bullet hole.

---

[13]Defense expert witness Jamie Becker testified that tattooing occurs when gunpowder particles impact the skin and bury themselves into it and that stippling occurs when the gunpowder particles hit with enough velocity to leave a punctuated mark or bruise; neither tattooing nor stippling can be washed or wiped off. Gunpowder that has lost velocity and merely sticks to or lands on skin can be wiped off and removed.

Denton County Sheriff's Office forensic investigator Ashleigh Berg[14] testified that she had been called to assist the Argyle police at 4:53 a.m.; she arrived at the scene around 6 a.m. While awaiting a search warrant, she obtained the gun from Sergeant Rounsavall, collected a gunshot-residue sample from Matthews's hands, and took photographs of Matthews. When she photographed Matthews, she could see several red marks on both sides of his neck and the back of his neck.

Berg photographed the house. The small kitchen had two exits—one into the back of the house and one into the living room. There was a blue gym bag[15] on the kitchen floor not far from Randall's legs; it contained a Springfield magazine loaded with ammunition similar to that found with the gun.[16] A spent cartridge case from

---

[14]Berg had a master's degree in forensic psychology and set up the Wise County crime-scene unit while completing her master's program. She was a certified peace officer and had been with the Denton County Sheriff's Office for eight years. She was also an adjunct professor in the Texas Forensic Science Academy through Texas A&M University, developing post-professional education for state, national, and international law enforcement. Berg had 400 hours of post-professional training in blood-stain-pattern analysis, was on the Association for Crime Scene Reconstruction's board of directors, and was a member of the International Association of Blood Stain Pattern Analysts.

[15]According to Chelsey and Baires, Matthews always carried this bag, which contained his wallet and other belongings, including his gun. Berg testified that the bag was not collected when the first search warrant was executed but that it was still there when the police executed a second search warrant.

[16]Callahan testified that Matthews's gun had only passive safeties, which are "safeties within the firearm that when you go through a normal shooting motion, they automatically deactivate themselves," and "are on until you go through a shooting motion to turn them off." The gun's trigger pull—the amount of force necessary on the trigger to effectively discharge the weapon—was a little over 5 pounds. For

12

Matthews's gun was found on some papers on the counter by the refrigerator.[17]  A bag of miscellaneous ammunition and a box of Winchester 9-mm ammunition were also on the kitchen counter.

Based on her blood-flow-pattern analysis, Berg said that Randall's head had been in an upright position when he suffered his forehead laceration.  There were multiple blood-stain patterns on the lower cabinet door behind where Randall had fallen, as well as on the counter near the sink.  Based on Randall's head wound and the blood-stain pattern, Berg concluded that what likely had occurred was that Randall's head had hit the sharp edge of the cabinet and then he slid, causing a "swipe" stain.  She could not determine whether it happened before or after the gunshot.[18]  She analyzed the bullet's trajectory to determine at what angle it went into the wall and determined that it went in at approximately 27 or 28 degrees, plus or minus 5 degrees.[19]  After hitting and killing Randall, the bullet had gone through three layers of

comparative purposes, Callahan said that carrying a gallon of milk on one finger was eight pounds, breaking the seal on a can of soda was about 4.5 pounds, and fully opening the can was about 6.5 pounds.

[17]Berg stated, "[O]nce a casing is ejected or expended, it behaves like a pin ball.  It can ricochet off any number of surfaces in an environment."

[18]Berg explained that crime-scene reconstruction involves the use of inductive and deductive reasoning and the scientific method to reconstruct the events of a given crime, starting from the end point and working backwards using all of the evidence.

[19]Berg testified, "[Y]our angle in shooting analysis or trajectory analysis is always an approximation.  It's plus or minus five degrees.  It's never an exact angle."

wall before bouncing off the back of the home's exterior wall.[20]   Berg's scene-reconstruction diagrams were admitted into evidence without objection and published to the jury.

Based on Berg's reconstruction from the location of Randall's entry and exit wounds and where the bullet hit the wall, she deduced that Randall had been standing when he was shot and had been facing the door towards the living room.  Berg's 3-D trajectory model placed Matthews in the doorway leading to the laundry room, roughly four feet away from Randall at the time of the shooting.

## B.  The Defense's Case

Becker, a firearm and toolmark analyst and forensic consultant,[21] and three character witnesses—a coworker, a sibling, and the maternal grandmother of

---

The plus-or-minus is part of the analysis because there is variation in a bullet's flight path, and there will be variation when it strikes the surface.

[20]Berg testified that the police returned to the home on August 2 to cut out the piece of bullet-struck wall.  During the defense's case, Becker agreed that Berg's testimony had been that "[the police] saw it, overlooked it, left it and then had to come back for it," and stated that alterations or changes to the pieces of wall could have affected Berg's ultimate conclusions.

[21]Becker had worked in forensics for thirty-three years, including sixteen years at the Tarrant County Medical Examiner's Office.  She provided continuing education services to prosecutors, defense attorneys, crime-scene investigators, and police officers on firearms and was a member of the Association of Firearm and Toolmark Examiners.  Berg had been an intern in the Tarrant County Medical Examiner's Office in the early 2000s, during Becker's tenure, and Becker had come into contact with her again when Berg started working for the Denton County Sheriff's Office.

Matthews's daughter[22]—testified in the defense's case before Matthews took the stand.

Becker testified that at the time of the 2017 offense, she had still been working in the Tarrant County Medical Examiner's Office crime laboratory as the technical leader of the firearms section. Becker stated that Denton County or the Argyle police could have asked the Tarrant County Medical Examiner's Office to perform distance-determining testing. Becker, who had written Tarrant County's distance-testing policies and procedures, stated that in 2017, the medical examiner's office would have done the distance determination in this case.[23] However, at no point from July 2017 onward did Berg ever call her about the case.

Based on her review of the file, Becker said that she would not disagree with Dr. Greenberg's testimony that the minimum firing distance would have been about two to four feet. From the crime-scene photos, she saw potential gunpowder residue on Randall's left sleeve and left chest area and explained that the closer the gun's muzzle was to a target contact, the heavier the residue deposition.

---

[22]Matthews's three character witnesses all opined that he was a peaceful and law-abiding citizen.

[23]Becker stated that the distance-determination process includes a stereoscopic examination (examination under magnification of the target material) as well as tracing or mapping of the location of any gunpowder residue or particles, digital or alternative-light-source photography, and chemical testing for the presence of nitrites, copper, and lead.

Becker agreed that trajectory does not identify where the shooter was standing but rather where the weapon was when it was fired. She stated that her mathematical calculations on the hole created in the wall by the gunshot were different from Berg's—and that Berg should have shown her mathematical work in her report—but that they "came in more of an agreement as to the angle of th[e] bullet hole" with Berg's testimony that the angle was about 27 or 28, plus or minus 5 degrees.[24] Becker said that she had come up with some different measurements than Berg, with a wider angle—33 degrees, from the drywall—and a narrower angle—18 degrees from the first wall layer—which averaged to 25.5 degrees, and that she would have reported both, as well as the break in the chain of custody.[25] She also disagreed with Berg's models because after the bullet struck Randall's neck, it would no longer have travelled in a straight line, but she could not say how much destabilization of the bullet's flight path had occurred after it was deflected by striking one of Randall's bones before it hit the wall. Becker would have included a limitation statement about the deflection.

---

[24]Becker testified that Berg should have included a limitation statement about how or when the pieces of wall were collected because they had not initially been collected during the execution of the first search warrant.

[25]Becker agreed on cross-examination with the statement that "[a]ll three methods used by two different people came to pretty much the same conclusion." Becker did not check the vertical trajectory and said she would not quibble with Berg's calculations on that because, looking at the photographs, she had no reason to doubt "the 90 plus or minus five."

Becker stated that Greenberg's representation of where Randall had stood was not the only position he could have been in because the angle of a bullet says nothing about which way someone's head was turned. Rather, the bullet angle provides information on entry, exit, and the bullet's ultimate resting place.

Matthews testified that he had lived in the small two-bedroom house for a little over three years; Chelsey had lived there for a little over a year after picking up the lease from Kyle. Four months after she started living there, Chelsey initially told him that Randall would be staying there for "a couple nights," and he had not objected. By July 30, 2017, Randall had been living with them for approximately nine months.

Matthews stated that during the nine-month period, he and Randall had been cordial but had never become friends and mainly tried to avoid each other. He denied having had any disagreements with Randall before July 30[26] and said that he spoke to Chelsey when there were problems such as when Randall smoked inside the house. When Randall had an issue with Matthews, Randall would call Chelsey. Matthews occasionally had conversations with Chelsey about her father's staying there longer than was expected.[27]

---

[26]During cross-examination, Matthews said he was unaware how Randall felt about his messiness and denied that Randall had ever left dirty dishes on Matthews's bed, but he agreed that Chelsey had told him about Randall's complaints that Matthews was too loud and stayed up too late.

[27]On cross-examination, Matthews agreed that Randall had overstayed his welcome and that he had wanted Randall to leave.

At the time of the shooting, Matthews had been working for four years at a job he loved. When asked why it seemed he was more concerned about his job than Randall during the 911 call, Matthews testified, "I don't know exactly where my head was at precisely. I know that I had called the cops, and I knew the cops were on the way. And I guess in my head at that time I thought the next best thing to do was call my employer," since he had to be at work at 8 a.m. that morning.

Matthews testified that he had nothing to drink before getting to the bar around seven that night and that he drank between six and eight beers.[28] Thomas, Chelsey, and Joe were there when he arrived, and Baires arrived shortly thereafter. Living arrangements at the house did not come up until after Baires arrived. According to Matthews, at some point after that, Chelsey told him that she and Joe were thinking about moving in together and asked whether he would consider taking over the lease. Matthews said that he would take over the lease but that there would be some changes, such as Randall's having to move out.[29] Chelsey told Matthews that she wanted to wait for two weeks to say anything to Randall because she did not want

---

[28]On cross-examination, Matthews agreed that he had also consumed "[m]aybe two" Vegas Bomb shots. He said he had not been drunk but acknowledged that there were parts of the evening he did not completely remember.

[29]Matthews said that at that point in the conversation, Randall's moving out "was a joke, but a joke with some like obvious realness behind it." Matthews stated that he jokingly asked her if Randall was going to be staying with her at Joe's house. Matthews said that it was not uncommon for Chelsey's friends to make jokes at Randall's expense.

an upcoming family reunion to be awkward. Matthews stated that at some point, the conversation became uncomfortable because Thomas started bashing Randall.[30] Joe ended the conversation about Randall, stating that it had gone too far.

Around 11 p.m., Chelsey, Joe, Thomas, and Baires left. Matthews had a couple more drinks and stayed until the bar closed at 2 a.m. because he was interested in the new bartender. He spent the rest of the evening trying to talk to her and going out to smoke with her when she took smoke breaks.

When the bar closed, Matthews opted not to risk driving and went to sleep in his car. When he woke up, he drove home despite still feeling some level of intoxication. He went inside and petted his dog, and the dog made noises that might have been loud enough to wake someone. He then heard a loud noise like a slamming door from the back of the house. Matthews went through the kitchen, planning to let his dog go outside before checking the noise. After letting his dog out, he heard a loud noise from the front of the house, which again sounded like a slamming door. He sat in the living room to wait for his dog to finish urinating, and Randall either came in or went out, slamming the patio door, and making a loud comment. Matthews did not recall the comment.[31]

---

[30]Randall had been married to Thomas's mother for around ten years, until Thomas was around thirteen years old. Thomas described his relationship with Randall as "[p]retty good" until his mother and Randall broke up.

[31]Matthews testified on direct examination that Randall slammed the patio door in front of him and made the comment while Matthews was sitting there and then

19

Matthews replied to Randall that he did not know what Randall's problem was but that nobody needed his attitude. Randall responded by asking him who he was talking to, implying "[Y]ou aren't going to talk to me like that." Matthews said he was still sitting and that Randall, who was upset, neared to within a foot or two. Matthews then told Randall that he did not have to watch what he said because Randall was going to be leaving in about two weeks. Matthews said this made Randall even more upset. Words, including some profanity, began flying between them. Randall told him that he did not believe him and that he needed to verify his eviction by calling Chelsey.

Randall called Chelsey and, according to Matthews, asked her if he was being kicked out.[32] At some point, Randall stopped talking to Chelsey and started talking to Matthews again.[33] Matthews made his way into the kitchen because Randall was inching back towards him again and was "very unhappy with [Matthews] at that point," and their argument proceeded to screaming at each other. Matthews said that

proceeded to come towards him. On cross-examination, Matthews said that Randall had been on his way outside and then Randall turned around, came right back in, walked up to confront him, and said, "What did you say to me?" and "Watch how you're talking to me."

[32]On cross-examination, Matthews agreed that Randall could have called Chelsey later that day about the eviction but that "he must have felt like he had to do it right then," at 4 a.m.

[33]Matthews also agreed that he could have gone outside or to his bedroom while Randall was talking with Chelsey. Instead, he continued to yell insults at Randall.

as they argued, Randall kept approaching, and when he called Randall a mooch and a bum,[34] this triggered a violent response—Randall came at him with his elbow and smashed Matthews in the face.[35]  Matthews said the pain was blinding and that he was shocked and became worried because he had not expected the altercation to become physical; Randall, a bigger man,[36] had never attacked him before.

Matthews kept a loaded gun in his duffle bag,[37] which he ordinarily left in the kitchen; the unzipped bag was on the counter.[38]  After Randall hit him, Matthews could not see, and Randall proceeded to wrestle with him.  At some point, Randall bent him over, put him in a headlock, and got a chokehold around Matthews's neck.  Matthews said that Randall started to suffocate him and force him to the ground, putting Matthews in fear for his life.  He was in the chokehold for five to ten seconds before he could get to his knees and sustain enough leverage to force Randall off of

---

[34]Matthews agreed that he had also called Randall a loser and a "piece of sh-t."

[35]Matthews stated that he did not recall exactly what he said to Randall that caused Randall to attack him.

[36]Randall weighed 268.9 pounds and was six feet, one inches tall.  Matthews weighed 240 pounds and was five feet, eleven inches tall.

[37]Matthews said that there had been a bullet in the gun's chamber and fifteen rounds in the magazine.

[38]On cross-examination, Matthews said that he had brought the bag in from his car when he entered the house and that he had put it down in the kitchen on the counter.

him.[39]  At that moment, he saw his bag with the gun on the floor within arm's distance, where it had been knocked during the struggle, and he went for the gun.  As he stood up, he fired the gun.  Matthews said that he had not believed that the fight was over when he fired the gun and that he had felt in fear for his life.

Matthews agreed that Randall had not been directly facing him when he fired the gun and that Randall had been at least two feet away.  When asked if he thought there had been any other action he could take short of firing the weapon, Matthews said no.  He explained, "I needed the attack to stop.  I was -- I didn't know if it was going to proceed.  I didn't -- I didn't know what was next, but I was nearly choked out."  He said, "[T]he thought in that moment was I was -- I was attacked and my gun was there.  I -- I went for my closest defense in that moment."  He said that after firing the weapon, he was in shock.

When asked whether he had heard Randall tell Chelsey to call the police, Matthews said that he had not and that he did not believe Randall had said that.  He denied having said, "Ha, you probably should call the cops," or "Yeah, you better call 911."  He also denied that Randall had tried to get out of the house before he shot him, that he had tried to block Randall from leaving, or that he had walked over to get the gun.  Matthews agreed that Chelsey had heard the gunshot and that he had heard screaming coming from Randall's phone.

---

[39]On cross-examination, Matthews denied—contrary to Chelsey's testimony—that Randall had said, "Hey, I am going to let you up, but you need to go cool down."

Matthews said that his phone description to the 911 operator—that Randall had "tried to f---ing choke [him] out on the ground, and [he] broke away and [he] shot him"—was how it happened. He denied having ever made a statement to the effect that if someone committed murder, he "should do CPR to make it look like it was self-defense." He stated that he did not begin CPR before being told to do so by the 911 operator because he thought Randall was dead.

During cross-examination, Matthews agreed that there was a doorway behind him that would have led to the backyard and other parts of the house, while the stove and a cabinet were behind Randall. He agreed that the police station was within walking distance and that Randall did not have a gun, a knife, or any other weapons.

On redirect, Matthews testified that he had never attacked Randall, that he did not kill him because he wanted him out of the house, and that he did not go into the kitchen wanting to kill him. He did not want to kill Randall when he picked up the gun; he wanted the assault to stop and did not see any other way to end it other than by shooting Randall. He stated that he thought Randall would have continued the assault if he had not shot him and that he had been in fear of losing his life because there was no one to stop the assault. Matthews said that he did not know whether he would have been able to get away from Randall to run to the police station.

23

## C. The Jury Charge, Closing Arguments, and Verdict

Eleven days passed between the closing of the parties' cases and the trial's reconvening, when the jury was instructed on self-defense and closing arguments were made. *See* Tex. Penal Code Ann. §§ 9.31(a)–(b), (e), .32(c).

The prosecutor argued that Matthews had murdered Randall without justification when he intentionally or knowingly shot him and that the jury's job was to judge Matthews's credibility with regard to whether shooting Randall was immediate, necessary, in response to unlawful deadly force, and reasonable. *See id.* She stated, "He was drunk. He was mad. And he murdered Randy Glover."

Defense counsel argued that Randall hit Matthews first and overpowered him and that Matthews had been in fear for his life because a chokehold can kill; she asked the jury to determine what a reasonable person standing in Matthews's shoes would have done. Defense counsel also argued that the State had not brought any evidence to contradict Matthews's character witnesses and that there was nothing to indicate that Matthews was the kind of monster who would kill someone "just because he did not want him as a roommate." Defense counsel pointed out that Chelsey's written police statement never mentioned hearing footsteps, and she contended that Randall would not have allowed Matthews to walk away to get the gun and that the scattered items, including the gym bag containing the gun, had been on the kitchen floor. Defense counsel argued, "[I]t's entirely reasonable to believe that [Matthews]

knocked . . . the bag over, it fell on to the floor, he grabbed the gun, and because he was in fear of his life, that he fired the weapon."

In rebuttal, the prosecutor argued that Matthews's behavior that night was not that of a reasonable person when he stayed out until 2 a.m., passed out in his car, had at least eight drinks and two shots, and was more worried about calling his job than performing CPR on the man he had shot. She contended that the evidence showed that Matthews shot Randall instead of exiting from either kitchen door and that Matthews's description of events was impossible.

The jury deliberated for several hours over two days before finding Matthews guilty of murder.

## D.  Application of Law to Facts

In his single issue, Matthews argues that there was no evidence to counter his testimony that he feared for his life, that he was justified in using deadly force to the extent he believed it was necessary to stop the assault, and that a rational trier of fact could not have found against his self-defense claim beyond a reasonable doubt.

When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594; *see Gaona*, 498 S.W.3d at 709 (discussing evidence to support jury's rejection of self-defense claim).[40]  We may not act as a

_____

[40]In *Gaona*, when the appellant started to leave, the victim told him to get out of his car and fight.  498 S.W.3d at 707.  The appellant testified that the victim had threatened to kill him when he refused to fight and that he knew the victim had a gun. *Id.*  The court concluded that the evidence was sufficient to support the jury's murder

thirteenth juror and must not disregard, realign, or reevaluate the weight and credibility of the evidence. *Fountain v. State*, 604 S.W.3d 578, 583 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (discussing evidence to support jury's rejection of self-defense claim).[41] When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the prosecution and defer to that determination. *Id.*

The evidence shows that Matthews killed Randall, an unarmed man over twenty years his senior,[42] by firing a gun at him in the kitchen's close confines. Based on the remaining evidence presented at trial, the jury could have determined that Matthews had murdered Randall without justification, could have believed or

---

finding, noting that even if it assumed the appellant's version of events would be sufficient to justify his use of deadly force, "other evidence disputed that version and support[ed] the jury's rejection of his self-defense claim." *Id.* at 709–10 ("A rational jury could have concluded appellant never believed deadly force was immediately necessary to protect himself against any unlawful deadly force but that he was angered when [the victim] cursed at him.").

[41]In *Fountain*, the appellant, who was driving around with a loaded AR-15 assault rifle, shot the unarmed victim, and a security camera at a nearby residence recorded the incident. 604 S.W.3d at 581. The appellant testified that in the days before the shooting, the victim had sent him text messages and had made social-media postings threatening to kill him and his sister. *Id.* at 581–82. Despite the appellant's arguments that the victim's pre-shooting threats against him and his family, as well as other evidence that the victim was prone to violence, weighed in his favor, "[t]he jury could have concluded from th[e] evidence that, under the circumstances, appellant did not reasonably believe that deadly force was immediately necessary to protect himself." *Id.* at 584.

[42]Matthews was thirty-five years old at the time of the trial.

disbelieved various portions of Matthews's or Chelsey's version of events,[43] or could have believed Matthews's account but nonetheless found against his self-defense claim because it determined that his belief that deadly force was immediately necessary was no longer reasonable[44] after he freed himself from the chokehold. *See* Tex. Penal Code Ann. §§ 9.31(a), .32(a). The jury was entitled to resolve any conflicts in the evidence and to determine the witnesses' credibility, *see Martin*, 635 S.W.3d at 679; *Fountain*, 604 S.W.3d at 583; *Gaona*, 498 S.W.3d at 710, and there was ample evidence for it to do so. Accordingly, we overrule Matthews's sole issue.

---

[43]For example, the jury could have chosen to disbelieve Matthews's testimony that Randall had called Chelsey at 4 a.m. to verify that she was evicting him in two weeks and instead to believe Chelsey's testimony that Randall called her to ask what was wrong with Matthews. The jury could have chosen to believe Chelsey's testimony that she heard footsteps before Matthews fired the gun over Matthews's testimony that the gun was on the floor where his bag had fallen and that he fired the gun as he stood up. Further, the jury could have chosen to believe Berg's testimony and diagrams over Becker's testimony with regard to distance determination, bullet angle, and how Randall was standing when Matthews shot him.

[44]Under the Penal Code's self-defense provisions, the "reasonably believes" language contains both subjective and objective components. *Lozano*, 636 S.W.3d at 32. The defendant must subjectively believe that another person used or attempted to use unlawful or deadly force against him and that the defendant's use of unlawful or deadly force in response was immediately necessary. *Id.* And the defendant's subjective belief must be reasonable, i.e., a belief that is held by an "ordinary and prudent man in the same circumstances as the actor." *Id.* (citing Tex. Penal Code Ann. § 1.07(a)(42), which defines "reasonable belief"). The "ordinary and prudent person" standard typically operates as a limitation on defendants who harbor unreasonable beliefs that the use of deadly force was immediately necessary, but it may also prevent a jury from acquitting a defendant based on self-defense when the defendant did not believe that he acted in self-defense. *Id.* at 33.

27

## IV. CONCLUSION

Having overruled Matthews's sole issue, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 10, 2022